**Dale C. CAMERON, Superintendent, Saint Elizabeths Hospital, Appellant,**

**v.**

**Carolyn MULLEN, a/k/a Rita Raymond, Appellee.**

**No. 20308.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 21, 1966.

Decided March 2, 1967.

---

Mr. Thomas Lumbard, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellant.

Mr. David C. Niblack, Washington, D. C. (appointed by this court), with whom Mr. Arthur J. Whalen, Jr., Washington, D. C., was on the brief, for appellee.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and WRIGHT, Circuit Judge.

BAZELON, Chief Judge:

During Mrs. Mullen's trial without jury in the Court of General Sessions on a misdemeanor charge of simple assault,[1] the court *sua sponte* adjourned the proceedings and committed her to Saint Elizabeths Hospital under D.C. Code § 24–301(a) (1961) [hereinafter Subsection (a)] for a determination of her competency to stand trial.[2] The hos-

---

1. D.C.Code § 22–504 (1961), which provides a maximum penalty of twelve months imprisonment and/or a fine of five hundred dollars.

2. Subsection (a) reads, in part:
   Whenever a person is arrested, indicted, [or] charged by information * * * for or with an offense and, prior to the imposition of sentence or prior to the expiration of any period of probation, it shall appear to the court from the court's own observations, or from prima facie evidence sub-

pital reported her competent. But it also reported that she suffered from a "personality pattern disturbance, paranoid personality," both at the time of the examination and at the time of the offense. The court thereupon found her competent to stand trial, and, after hearing further testimony, found her not guilty by reason of insanity, although she did not raise that defense and objected to the court's considering it. On the Government's motion, the court held a hearing and committed her to Saint Elizabeths expressly pursuant to Subsection (a) which provides that "prior to the imposition of sentence" a person may be committed if found of "unsound mind," or "mentally incompetent to stand trial." The subsection specifies no standard for release, but the order provided for confinement until she could meet the standards for release applied to the civilly committed.

Appellee then petitioned the District Court for a writ of habeas corpus, claiming *inter alia* that the Court of General Sessions had no jurisdiction to commit her under Subsection (a).[3] The District Court issued the writ and ordered her released, on the ground that Subsection (a) did not empower the court to act after it entered the verdict of not guilty by reason of insanity. The Government appeals.[4] We affirm.

mitted to the court, that the accused is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense, the court may order the accused committed * * * for such reasonable period as the court may determine for examination and observation and for care and treatment if such is necessary * * *.

3. She also appealed to the District of Columbia Court of Appeals seeking reversal of the trial court's action. That appeal, which is still pending, does not bar habeas corpus in the circumstances of this case. The doctrine of exhaustion of remedies is "not one defining power, but one which relates to the appropriate exercise of power." Bowen v. Johnston, 306 U.S. 19, 27, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939). See Fay v. Noia, 372 U.S. 391, 420, 83 S.Ct. 822, 9 L.Ed.2d 837(1963); Sunal v. Large, 332 U.S. 174, 178–179, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947). The Government acquiesced in the District Court's exercise of power to hear this case and defended its action at oral argument before us. We find no basis for overturning the District Court on this ground. Respondent raised serious doubts as to the jurisdiction of the Court of General Sessions under Subsection (a), see Cameron v. Fisher, 116 U.S.App.D.C. 9, 320 F.2d 731 (1963), contrary to the District of Columbia Court of Appeals case-law sustaining jurisdiction, see United States v. Limber, D.C.Mun.App., 192 A.2d 530 (1963). It is quite evident that the appeal from commitment will entail longer delay in final disposition than the habeas corpus proceedings and might unduly extend her illegal detention.

4. Respondent's brief calls attention to the fact that she eloped from Saint Elizabeths Hospital after the District Court stayed its order of release. Neither party, however, has urged that the elopement should moot this appeal. We think that it does not. The District Court had jurisdiction over Mrs. Mullen at the time of its order, and our appellate function is to act upon the propriety of that decision. Eagles v. United States ex rel. Samuels, 329 U.S. 304, 306–308, 67 S.Ct. 313, 91 L.Ed. 308 (1946). If we affirm, we erase her fugitive label, while if we reverse, we guarantee the hospital authority to re-establish control over her. *Ibid.* As long as there is an order of restraint on her liberty outstanding, and as long as her custodians are within the jurisdiction, this case is not moot, *ibid.*, see Ex Parte Endo, 323 U.S. 283, 304–307, 65 S.Ct. 208, 89 L.Ed. 243 (1944), and it cannot be dismissed on the ground that she is not "in custody" for habeas corpus purposes. See Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed. 2d 285 (1963). Nor can we allow respondent to moot the Government's appeal; dismissal of the appeal would result, in effect, in affirmance of the District Court without a determination of the merits of the Goverment's claim. Thus this case is unlike Ragsdale v. Cameron, 117 U.S.App.D.C. 278, 329 F.2d 233 (1963), where we dismissed an appeal from a *denial* (not, as here, a grant) of habeas corpus when the *appellant* (not, as here, the respondent) eloped.

## I

.Since the Supreme Court's decision in Lynch v. Overholser,[5] Subsection (a) has been used not only for commitment for examination of competency to stand trial but also for the commitment after trial of those found not guilty by reason of insanity over their objection.[6] Lynch was found not guilty by reason of insanity, although he sought to plead guilty, and was committed under D.C.Code § 24–301(d) (1961) [hereinafter Subsection (d)], which requires automatic commitment upon an acquittal based "solely on the ground that * * * [the defendant] was insane" at the time of the crime. The Supreme Court held that Congress did not intend to allow automatic commitment without a hearing on the issue of present insanity when the defense of insanity is thrust upon a defendant who objects.

The Court concluded: "We decide in this case *only* that if * * * the defendant, despite his own assertions of sanity, is found not guilty by reason of insanity, § 24–301(d) does not apply." (Emphasis supplied.) It added that: "If commitment is then considered warranted, it must be accomplished either by resorting to § 24–301(a) or by recourse to the civil commitment provisions * * * ."[7] In Cameron v. Fisher, 116 U.S.App.D.C. 9, 320 F.2d 731 (1963), we considered the Supreme Court's reference to Subsection (a) as an alternative commitment procedure. We said that the "actual holding of the Court· in *Lynch* * * * was not with respect to Section 301(a). * * * [T]he holding was that the mandatory commitment requirement of Section 301(d) does not apply to a person acquitted on the ground of insanity when he * * * sought to plead guilty." *Id.* at 12, 320 F.2d at 734.

Although the availability of Subsection (a) was not urged in *Lynch,* or in any other case in any court as far as we are aware, and although its availability was unnecessary to the disposition of the question whether Subsection (d) applies to one who refuses to raise the insanity defense, the Court said, "it appears"[8] that Subsection (a) is available for commitment of those acquitted by reason of insanity over their objection. But it also said that the legislative history of Subsection (d) showed that Congress was concerned only with commitment of those who had "pleaded insanity as a defense";[9] that mandatory commitment for those who refused to plead the insanity defense would be "out of harmony with the awareness that Congress has * * * shown for safeguarding those suspected of mental incapacity against improvident confinement"[10] in the civil commitment provisions; and finally that alternative commitment procedures, including civil commitment, would effectuate the legislative goal of protecting the public against the dangerously insane and yet aviod "improvident confinement."[11] Based upon these considerations, the Court concluded that Congress did not intend Subsection (d) to be applicable to persons who refuse to raise the insanity defense. The Court's comment—that "it appears [Subsection (a) is] * * * available"—must be viewed as "going beyond" the point "presented for decision" in *Lynch.* Hence, that comment is not controlling here, where "the very point is presented for decision." See Cohens v. Commonwealth of Virginia, 19 U.S. [6 Wheat.] 264, 398, 5 L.Ed. 257 (1821).

In Cameron v. Fisher, we also said that:

[The Supreme Court's] * * * reference to Section 301(a), along with

---

5. 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

6. See, *e. g.,* Staffiero v. Cameron, No. 20532, argued January 31, 1967; United States v. Limber, D.C.Mun.App., 192 A. 2d 530 (1963).

7. 369 U.S. at 719–720, 82 S.Ct. at 1072.

8. *Id.* at 719, 82 S.Ct. 1063.

9. *Id.* at 717, 82 S.Ct. 1063.

10. *Id.* at 711, 82 S.Ct. at 1067.

11. *Id.* at 711, 714, 720, 82 S.Ct. 1063.

civil commitment, as means for securing adjudication of unsoundness of mind, when a commitment under the mandatory provisions of Section 301 (d) is not proper  *  *  *  was not a holding that Section 301(a) was available after the criminal charge which brought the person into court had been entirely disposed of.  The Court referred to Section 301(a) in connection with the "pretrial commitment" of an accused antedating a finding of guilt. It is in this light that we read the Court's further statement that since the inquiry under Section 301(a) "may be undertaken at any time 'prior to the imposition of sentence,' it appears to be as available after the jury returns a verdict of not guilty by reason of insanity as before trial."  *  *  * But surely the time available after verdict of not guilty by reason of insanity, within which it was thus thought a commitment under Section 301(a) for unsoundness of mind might be made, was not intended by the Court to be extended *beyond the time the criminal charge is decided and the question of custody incident to the disposition of the charge is determined.* 116 U.S.App.D.C. at 12, 320 F.2d at 734 (emphasis supplied).

Accordingly, we held in *Fisher* that, notwithstanding the Supreme Court's dictum in *Lynch*, "the [trial court]  *  *  * at the time of its order committing appellee to St. Elizabeths pursuant to a hearing under Section 301(a), was without jurisdiction of the case for the purpose of such commitment." *Ibid.*

The Government argues that *Fisher* is not controlling, because there a full year had elapsed between the time the defendant was found not guilty by reason of insanity and the time the Government invoked Subsection (a). Here, it says, proceedings were instituted minutes after the judge's verdict. We think *Fisher* does not turn on length of time.  When a person has been found not guilty by reason of insanity, "the criminal charge is decided," [12] and there is no "question of custody incident to the disposition of the charge" unless some statute requires further disposition.  The language of Subsection (a) does not expressly provide for further disposition, and indeed seems to exclude it.  We read the subsection as authorizing commitment only "prior to the imposition of sentence or prior to the expiration of any period of probation." But there can be no sentence or probation period upon a verdict of not guilty, by reason of insanity or otherwise. [13]

Our conclusion that Subsection (a) does not authorize commitment after a verdict of not guilty by reason of insanity is buttressed by comparing Subsection (a) with Subsection (d), enacted at the same time.  In Subsection (d) Congress expressly requires disposition by commitment.[14]  The absence of any comparable explicit direction or authorization in Subsection (a) makes clear that

---

12. See Rouse v. Cameron, 125 U.S.App. D.C. 366, 373 F.2d 451, decided October 10, 1966.  Of course, the verdict of not guilty by reason of insanity presupposes the conclusion that the defendant committed the acts charged.  Rucker v. United States, 108 U.S.App.D.C. 75, 77, 280 F.2d 623, 625 (1960).  But the verdict is itself a conclusion that the prosecution has failed to prove an element of the case—the defendant's criminal responsibility—necessary to make the commission of the acts *a crime.*  Davis v. United States, 160 U.S. 469, 485–488, 16 S.Ct. 353, 40 L.Ed. 499 (1895).  See also O'Beirne v. Overholser, 109 U.S.App. D.C. 279, 282, 287 F.2d 133, 136 (1960).

13. Unlike sentence or probation, commitment is not punitive.  See, *e. g.,* Overholser v. Lynch, 109 U.S.App.D.C. 404, 408–410, 288 F.2d 388, 392–394 (1961), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1963).

14. "If any person tried  *  *  *  for an offense  *  *  *  is acquitted solely on the ground that he was insane at the time of its commission, *the court shall order such person to be confined in a hospital for the mentally ill.*"  D.C. Code § 24–301(d) (1961) (emphasis supplied).

the subsection was not intended for post-verdict commitment.

■ There is another reason why Subsection (a) should not be read as authorizing the post-verdict commitment of respondent. When "it shall appear to the court from [its] own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or * * * mentally incompetent so as to be unable" to stand trial, this subsection authorizes the court to confine him for the "reasonable" time required for "examination and observation and for care and treatment if * * * necessary." But the subsection further provides that if the hospital reports that the person is of unsound mind or mentally incompetent, the court may commit him to a mental hospital unless he or the Government objects, in which event the court must hold a hearing to determine "the competency of the accused to stand trial." Thus, although the section speaks of both unsoundness of mind and incompetency to stand trial, it empowers the court to hold a hearing only to determine competency.[15]

## II

We think, moreover, that under the logic of the Supreme Court's recent decision in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), serious constitutional doubts would attend any construction of Subsection (a) which authorized post-verdict indefinite confinement.

*Baxstrom* involved a New York statute [16] which provided that when a prisoner, placed in a mental hospital while serving his time, was reaching the end of his sentence, he could be committed to a mental hospital simply upon a certificate of the hospital superintendent that he was insane and a determination by the court that he "may require care and treatment." Under that statute, Baxstrom, unlike all others civilly committed, (1) was not entitled to a de novo review by a jury trial of the determination that he was insane,[17] and (2) could be sent to a hospital for the dangerously insane—where such substantive privileges as the right to receive mail and visitors were limited—without a hearing to determine his suitability for such confinement.[18]

15. Williams v. Overholser, 104 U.S.App. D.C. 18, 19, 259 F.2d 175, 176 (1958), held that Subsection (a) is available only for purposes of determining competency to stand trial. We there pointed out that Subsection (a) concludes: "If the court shall find the accused to be then of unsound mind or mentally incompetent to stand trial, the court shall order the accused confined to a hospital for the mentally ill." But we held that this sentence "in its context, comes only to this; the court shall order the accused confined in a mental hospital if it finds that because of unsoundness of mind or for any other reason he is mentally incompetent to stand trial." See also Cameron v. Fisher, *supra* n. 3, 116 U.S. App.D.C. at 13, 320 F.2d at 735.

16. New York Correction Law, McKinney's Consol.Laws c. 43, § 384. At the time of Baxstrom's commitment, the statute read in part:

> Within thirty days prior to the expiration of the term of a prisoner confined in the Dannemora state hospital, when in the opinion of the director such prisoner continues insane, the director shall apply to a judge of a court of record for the certification of such person as provided in the mental hygiene law for the certification of a person not in confinement on a criminal charge. The court in which such proceedings are instituted shall if satisfied that such person may require care and treatment in an institution for the mentally ill, issue an order directing that such person be committed to the custody of the commissioner of mental hygiene to be placed in an appropriate state institution of the department of mental hygiene or of the department of correction as may be designated for the custody of such person by agreement between the heads of the two departments.

17. Compare New York Mental Hygiene Law, McKinney's Consol.Laws, c. 27, § 74.

18. Compare New York Mental Hygiene Law § 85.

New York sought to justify this differential classification both for purposes of commitment and conditions of confinement on the ground that prisoners found insane during their sentence had "dangerous or criminal" propensities, and were therefore distinguishable from others subject to civil commitment. The Supreme Court struck down the New York system as a violation of the requirements of equal protection of the law. The Court held that "dangerous or criminal" propensities could not affect the procedures for commitment:

> Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all.*" 383 U.S. at 111, 86 S.Ct. at 763. (Emphasis in original.)

And the Court also held that conditions of confinement may not be determined arbitrarily:

> While we may assume that transfer among like mental hospitals is a purely administrative function, where, as here, the State has created functionally distinct institutions, classification of patients for involuntary commitment to one of these institutions may not be wholly arbitrary. 383 U.S. at 114, 86 S.Ct. at 764.

In the District of Columbia, the differences between commitment under Subsection (a) and civil commitment under the 1964 Hospitalization of the Mentally Ill Act [hereinafter 1964 Act] are more pronounced than the differences struck down by the Supreme Court in *Baxstrom.*[19] Among the commitment procedures guaranteed by the 1964 Act—but not by Subsection (a)—are the rights to a separate hearing before the Mental Health Commission and to a de novo judicial hearing, with a jury if desired, on the issue of insanity.[20] Among the conditions of confinement guaranteed to those committed by the Act—but not by Subsection (a)—are (1) the right to a judicial determination as to whether "other alternative courses of treatment" short of full-time confinement would be appropriate;[21] (2) the right to a complete examination every six months to determine the patient's mental health;[22] (3) the right to an examination performed by an independent practitioner every six months;[23] and (4) the right to receive mail, to hold property and enter into contracts, to hold a driver's license, and to vote.[24]

The Government here seeks to justify these differences on the ground that "the accused has been found not guilty, solely by reason of [her] mental condition, of a charge of crime" and thus presumably constitutes a greater danger to the public than those civilly committed.[25] This justification has found expression in sev-

---

19. In New York, Baxstrom was denied (1) a de novo jury hearing on the question of his mental health, and (2) rights to freely receive mail and have visitors while at the hospital for the dangerously insane. New York Correction Law § 388.

In the District of Columbia, the 1964 Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501—21–591 (Supp. V, 1966), creates a panoply of rights which are outlined in the text above. With the exception of § 21–562 (right to treatment) and § 21–563 (limits on use of mechanical restraints), these rights are limited to those who are to be committed under the Act. See Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, decided October 10, 1966.

20. D.C.Code §§ 21–541—21–545 (Supp. V, 1966).

21. D.C.Code § 21–545(b) (Supp. V, 1966). See Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966).

22. D.C.Code §§ 21–546, 21–548 (Supp. V, 1966).

23. D.C.Code § 21–546 (Supp. V, 1966).

24. D.C.Code §§ 21–561, 21–564 (Supp. V, 1966).

25. See Government's Brief, p. 18. The Government recognizes that Congress enacted D.C.Code § 24–301 to deal specially with those of the mentally ill whom it considered dangerous because of their commission of criminal acts. *Id.* at 8.

eral of our cases, and was the basis for Congressional adoption of D.C.Code § 24–301 in its present form in 1955.[26] It is similar to the justification offered by New York in support of the procedures by which Baxstrom was committed.

The petitioner in *Baxstrom* had completed his sentence. The respondent here was never under sentence. But both had been involved in prior criminal activity, both were summarily committed because of it, and both could seek release by habeas corpus. The Supreme Court struck down the New York system not because Baxstrom was reaching the end of his sentence, but because it held dangerousness is not relevant to the *procedures* for determining whether a "person is mentally ill *at all.*"[27] And the Court must have concluded that habeas corpus was no substitute for a full hearing, for the Court did not mention that remedy, although New York had urged it as an adequate safeguard.[28] *Baxstrom* thus might be said to require the conclusion that, while prior criminal conduct is relevant to the determination whether a person is mentally ill and dangerous, it cannot justify denial of procedural safeguards for that determination.

*Baxstrom* might also be said to require the conclusion that, while prior criminal conduct is a relevant consideration for determining the conditions of custodial care, it does not provide an automatic basis for allowing significant and arbitrary differences in such conditions. It is not clear whether all of the rights under the 1964 Act are accorded independently of the Act to those committed under Subsection (a). The fact is, however, that Congress has protected these rights with express care for those

26. See, e. g., SEN.REP. No. 1170, H.R. REP. No. 892, 84th Cong., 1st Sess. (1955), at p. 13: "The Committee is of the opinion that the public is entitled to know that, in every case where a person has committed a crime as a result of a mental disease or defect, such person *shall* be given a period of hospitalization and treatment to guard against imminent recurrence of some criminal act by that person" (Emphasis in original.) See Overholser v. Leach, 103 U.S.App. D.C. 289, 291, 257 F.2d 667, 669 (1958), cert. denied, 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959); Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960); Overholser v. O'Beirne, 112 U.S.App.D.C. 267, 302 F.2d 852 (1961). See also Lynch v. Overholser, 369 U.S. 705, 715–716, 82 S.Ct. 1063 (1962); Krash, *The Durham Rule and Judicial Administration of The Insanity Defense in the District of Columbia*, 70 YALE L.J. 905, 941–42 (1961).

27. This view of *Baxstrom* was followed by the New York Court of Appeals in People v. Lally, 19 N.Y.2d 27, 277 N.Y.S. 2d 654, 224 N.E.2d 87 (1966), where the Court considered the New York mandatory commitment statute for persons acquitted by reason of insanity, and expressly recognized its similarity in purpose to D.C.Code § 24–301. The New York Court held that mandatory commitment did not afford procedures and benefits substantially equivalent to those pro-

vided for civil commitment. Instead of declaring the statute violative of the equal protection clause, however, the Court chose to impose requirements for mandatory commitment which do not appear in the statute. In one breath, the *Lally* Court denied that *Baxstrom* requires equivalent procedures and benefits; but in the very next breath, the court "amended" the statute to comport with the view that *Baxstrom* bars dangerousness as an automatic basis for procedural discrimination among the mentally ill. Any doubt that the Court knew its choice to be between "amending" the statute and declaring it unconstitutional is resolved by its reliance upon People ex rel. Morriale v. Branham, 291 N.Y. 312, 317, 52 N.E.2d 881 (1943), and People v. Finkelstein, 9 N.Y.2d 342, 214 N.Y.S.2d 363, 174 N.E.2d 470 (1961), wherein statutes were saved from unconstitutionality by imposition of requirements not prescribed by the legislature.

28. This raises the question whether habeas corpus is an adequate remedy in the District of Columbia, where the burden of proof is on the petitioner to establish his right to release beyond a reasonable doubt. See Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 312, 281 F. 2d 943, 947 (1960). In civil commitment, there is provision for hearing before the Mental Health Commission and for de novo jury review.

civilly committed and has not done so for those committed under Subsection (a).[29]

Under *Baxstrom*, however, it may be argued that differences in the consequences of confinement must be justified by rational differences inhering in the individual's mental illness and his need for treatment. The 1964 Act requires this justification for those committed under it; it spells out specific requirements for curtailing the confinement rights of those incapable of exercising them.[30] And there may be no rational basis for limiting rights specifically designed to insure more adequate care, such as the right to be re-examined every six months, to those committed under the Act.[31]

### III

The Government seems to suggest that, even if Mrs. Mullen is entitled to the benefits of civil commitment, she in fact received them. There is no transcript of the commitment hearing in the Court of General Sessions, although the trial judge filed a memorandum opinion four months after the event describing what had occurred.[32] The Government relies on this opinion to demonstrate that the judge determined the respondent's mental condition under the standards embodied in the civil commitment provisions, that he instructed the hospital to apply civil release standards, and that he required that she be given all of the custodial benefits given to those civilly committed. Thus, it claims, respondent was not prejudiced by commitment proceedings under Subsection (a).

The trial judge's memorandum opinion makes it clear that several elements of a civil commitment determination were absent. First, there was no hearing before the Mental Health Commission prior to the hearing before the court, as there is for those civilly committed. Second, although the trial judge indicated that if requested he would have granted the de novo jury determination provided by the 1964 Act, it does not appear that he advised Mrs. Mullen of that right, as the Act requires.[33] Finally, the trial judge made no determination whether alternative courses of treatment existed short of full-time confinement, as is also required by the Act.

■ Subsection (a) did not authorize the trial judge's actions in affording a hearing to determine mental condition for commitment purposes, in applying

---

**29.** Prior to the 1964 Act, any person committed to Saint Elizabeths was automatically considered incompetent for most purposes. See Gillis v. Cameron, 116 U.S.App.D.C. 387, 390–391, 324 F.2d 419, 422–423 (1963). The 1964 Act would seem to eliminate this automatic consequence of commitment. D.C.Code § 21–564(b) (Supp. V, 1966) reads in part:
A person in the District of Columbia who, by reason of a judicial decree ordering his hospitalization entered prior to * * * [the adoption of the Act], is considered mentally incompetent and is denied the right to dispose of property, execute instruments, make purchases, enter into contractual relationships, vote, or hold a driver's license solely by reason of the decree, shall, upon the expiration of the one-year period immediately following * * * [the adoption of the Act] be deemed to have been restored to legal capacity * * *.
However, while the Act might be read to disallow any automatic incompetency determination, it clearly guarantees the civil rights itemized above only for those "hospitalized pursuant to" the Hospitalization of the Mentall Ill Act. See D.C. Code § 21–564(a) (Supp. V, 1966). Thus, for those committed under Subsection (a), the status of these confinement rights is not clear.

**30.** See D.C.Code §§ 21–561, 21–564(a) (Supp. V, 1966).

**31.** See Rouse v. Cameron, 125 U.S.App. D.C. 366, 373 F.2d 451, decided October 10, 1966.

**32.** Because of our disposition of the case, we need not decide whether the absence of a transcript at the commitment hearing is fatal. *Cf.* Kent v. United States, 383 U.S. 541, 561, 86 S.Ct. 1045, 16 L.Ed. 2d 84 (1966) ; Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964).

**33.** D.C.Code § 21–544 (Supp. V, 1966).

the release standards of the 1964 Act, and in extending to Mrs. Mullen confinement rights which the 1964 Act guarantees only to those civilly committed.[34] We cannot confer upon the Court of General Sessions authority to impose conditions reserved for civil commitment proceedings, since Congress has given the District Court exclusive jurisdiction over such proceedings.[35]

To import all of the civil standards into Subsection (a), and thus to avoid the constitutional difficulties suggested by Baxstrom v. Herold, we would have to rewrite completely that section as well as the Hospitalization of the Mentally Ill Act. We are not willing to do so. As the Supreme Court has said:

> It must be remembered that "[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute * * *" or judicially rewriting it. Scales v. United States * * * [367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782]. To put the matter another way, this Court will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects. (Aptheker v. Secretary of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964)).

We thus conclude that Subsection (a) is inapplicable to appellee. If the Government desires to commit Mrs. Mullen, it must institute civil commitment proceedings in order to do so. The 1964 Act provides adequate emergency procedures[36] by which a person who may be mentally ill and dangerous can be confined during the pendency of the civil commitment proceedings.

Affirmed.

---

34. See footnote 19, *supra*.

35. D.C.Code § 21–501 (Supp. V, 1966) defines "court" for purposes of civil commitment as the "United States District Court for the District of Columbia."

36. See D.C.Code §§ 21–521—21–528 (Supp. V, 1966). Because of the availability of these procedures, we need not decide whether Subsection (a) can be read to authorize commitment, where a verdict of not guilty by reason of insanity is entered over objection, for the limited purpose of examining and treating a person during the pendency of civil commitment proceedings.