Daniel C. YODER, Petitioner,

v.

COUNTY OF CUMBERLAND and Charles
Sharpe, Sheriff, Respondents.

Supreme Judicial Court of Maine.

June 2, 1971.

Robert E. Mittel, Portland, for plaintiff.

Alexander MacNichol, Asst. County Atty., Portland, Keith N. Edgerly, Asst. Atty. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY and WERNICK, JJ.

WERNICK, Justice.

ON REPORT.

This is a proceeding for habeas corpus. It was brought, pursuant to 14 M.R.S.A. §§ 5513 et seq., before a single Justice of the Supreme Judicial Court sitting in the Superior Court. The petition alleges that petitioner was being illegally confined in the Cumberland County Jail by the respondent Sheriff of Cumberland County.

Upon a motion by petitioner, and after hearing on the motion, the petitioner was released from incarceration by the presid-

ing Justice on his personal recognizance pending hearing and final decision of the case. Subsequently, the State of Maine became a party respondent.

Answers were filed by the respondents, County of Cumberland and Charles Sharpe as well as by the intervening respondent, the State of Maine.

Thereafter, upon motion of petitioner granted by the presiding Justice, petitioner filed an "Amended and Supplemental Petition for Habeas Corpus" to which, apparently, none of the respondents elected to file an amended or supplemental answer.

All of the parties stipulated before the presiding Justice an "Agreed Statement of Facts" and an "Agreed Statement of Issues" in which were asserted alleged violations of the constitutional rights of the petitioner under the "due process" and "equal protection of the laws" clauses of the Fourteenth Amendment of the Constitution of the United States.

The presiding Justice has reported the cause upon the pleadings, agreed facts and issues, and this Court is to render such decision as the rights of the parties require.

The "Agreed Statement of Facts" narrates the history of a divorce case as the result of which a "capias" execution for non-payment of attorney's fees had been issued against the husband, as the defendant in the divorce proceeding, the present petitioner, Daniel C. Yoder.

The divorce complaint instituting the proceeding and served on the petitioner contained a prayer that petitioner be ordered by the court to pay attorney's fees to enable his wife, Nancy M. Yoder, to prosecute the divorce and for a "capias" execution in the event of non-payment. Between commencement of the divorce proceeding and the date of hearing on the divorce, petitioner had made intermittent payments to his wife's attorney on account of the attorney's fees. When the hearing

was held and judgment was entered granting the divorce, petitioner was unemployed and the full amount of the fees properly chargeable by the attorney for the plaintiff was unpaid. Counsel for the plaintiff informed the Court that attorney's fees were still owing. Petitioner failed to appear at the divorce hearing either by counsel or in person.

The judgment of divorce contains the following language:

"It is further ordered and decreed that the said Daniel C. Yoder pay to * * * attorney for said Nancy M. Yoder the sum of Two hundred dollars as counsel fees, capias execution to issue therefor forthwith."

The Agreed Statement of Facts fails to clarify whether at the time of the judgment ordering payment of counsel fees and authorizing immediate issuance of a "capias" execution, (1) petitioner was in fact *able or unable to pay* the amount of two hundred dollars (or any portion thereof still remaining legitimately due and unpaid) or (2) the Court had knowledge of such ability or disability. The stipulation is only that petitioner was "unemployed" and

"there had been no allegation by the plaintiff * * * nor any finding by the court that the petitioner was able to pay; and the petitioner did not interpose as a defense his inability to pay. He did not appear."

In any event, we cannot here speculate as to whether, had there been in fact an honest inability of the petitioner to pay the attorney's fees at the time of the divorce judgment and the Court had been so informed, the Court would have refrained from ordering issuance of a capias execution for the non-payment of the counsel fees which the Court had required to be paid. The critical point is that 19 M.R.S.A. § 722 (hereinafter § 722)[1] itself autho-

---

1. "Pending a petition to enforce a decree of alimony, or a decree for payment of money instead thereof, or for the support of minor children, or a decree for

rized (by the plain language "upon default of any payment"), and the court judgment ordered, that an execution running against the body of the petitioner be *automatically and summarily* issued because of non-payment and regardless of the reasons for non-payment.

Pursuant to the order in the judgment of divorce authorizing issuance of a "capias" execution "forthwith", a "capias" execution, dated April 7, 1969, was issued by the District Court of Southern Cumberland. Approximately two months thereafter petitioner was arrested by respondent Sheriff, Charles Sharpe, and incarcerated in the Cumberland County Jail under the authority of the capias execution. At the time of the arrest and imprisonment, petitioner was "unemployed" and "was unable to make payments * * *." We interpret this stipulation that petitioner was "unemployed" and "unable to make payments", nothing contraindicative appearing, to mean that petitioner was honestly without property resources from which satisfaction of his adjudicated civil obligation to pay money could be accomplished.

Petitioner remained in the Cumberland County jail slightly more than a month (June 4, 1969 to July 7, 1969) when, upon initiation of his petition for habeas corpus, he was enlarged from jail on his personal recognizance to await final decision of the case.

The conjoined usage in § 722 of the language "execution * * * as in actions of tort" and "execution * * * against the body", and the District Court Judge's identification in his judgment of divorce of the execution ordered under § 722 as a "capias" execution, are significant on the issues now before us. The significance is that there thus appears preliminary indication that the same policy which governs *executions*, generally, which are utilized to seize and incarcerate the body of a person adjudicated subject to a civil obligation to pay money,—(and variously designated "capias" execution, or execution "running against the body", or execution "as in actions of tort")—is likewise operative, *specifically*, as to § 722.

Prior to 1941 there could have been no doubt of the correctness of this proposition. Then absent from § 722 was the present language which denies the right to relief under 14 M.R.S.A. Chapters 503 and 505 (prescribing "poor debtor" and "disclosure" procedures when there is arrest and imprisonment on mesne process and execu-

support pending the divorce action or for payment of counsel fees, or for the alteration of an existing decree for the custody or support of minor children, the court may order the husband or father to pay to the wife or mother, or to counsel for the wife or mother, sufficient money for the prosecution or defense thereof, upon default of which order execution may issue as in actions of tort. Execution for attorney's fees shall not issue until the action for divorce has been heard. Petition for such execution may be signed by the person seeking same or his attorney of record in such divorce action. At the time of making a final decree in any divorce action, the court may order that execution and such reasonable attorney's fee as the court shall order shall issue against the body of any party to the action charged with the payment of support of minor children or payments of alimony or a specific sum in lieu thereof, upon default of any payment, and the court shall order that the clerk of said court shall issue such execution. When the husband or father is committed to jail on execution issued upon decree of alimony, or for payment of money instead thereof, or for the support of his minor children, or for support pending the divorce action, or for payment of counsel fees, the county having jurisdiction of the process shall bear the expense of his support and commitment and he may be discharged from imprisonment by payment of the execution and all costs and expenses of his commitment and support, and he shall not be entitled to relief therefrom under Title 14, chapters 503 and 505. He may petition the court issuing such execution for relief, whereupon a judge of such court after due notice to the wife or mother, and hearing thereon, may order his discharge from imprisonment on such terms and conditions as justice may require."

tion). The denial in § 722 of the procedures of 14 M.R.S.A. Chapters 503 and 505 is accompanied by the substitution of a right to "petition the court * * * for relief * * * [by] discharge from imprisonment on such terms and conditions as justice may require."

This change, commencing after 1941 (P.L.1941, Ch. 81), to allow relief only by petition to the committing court substitutes (1) flexibility ("terms and conditions") for the rigidities of bonding and "poor debtor" oaths and (2) requires inquiry and determination by a judge of a court instead of an alternative of a disclosure before nonjudicial persons—as the mechanism by which release from confinement shall be achieved.

█ It is our opinion, however, that the change intended to retain, as one *controlling* criterion to guide the court in deciding "terms and conditions as justice may require" to allow release of a person confined pursuant to body execution under § 722, the same substantive policy long established under Maine's poor debtor and disclosure statutes. Thus, while the court under the release provisions of § 722 might be authorized to be more *lenient* (under the language "terms and conditions as justice may require") in ordering release from incarceration under § 722, this language, we hold, lacks effect to allow the court to keep a person incarcerated under § 722 if such person would be entitled to release under the policy principles embodied in the poor debtor and disclosure statutes—14 M.R.S.A. Chapters 503 and 505.[2]

The basic policy long attributed to the "disclosure" and "poor debtor" statutes of Maine, generally, and which we now hold continues as an indispensable minimum objective sought to be achieved by the provisions for body executions and release from confinement under § 722, has been declared in many prior decisions of this Court. Farrington v. Farrar, 73 Me. 37, 42 (1881); Jones v. Jones, 87 Me. 117, 119 32 A. 779 (1895); Karam Pet'r v. Marden, 128 Me. 451, 452, 148 A. 691 (1930), and Vesanen v. Pohjola et als., 140 Me. 216, 226, 36 A.2d 575 (1940).

In Farrington v. Farrar, supra, it was said:

"* * * the sole purpose for which it is proper to give a creditor power over his debtor's body, is to secure a true disclosure of the state of the debtor's affairs and his means of payment and the honest appropriation of such means as he actually has, not exempt by law from attachment and execution, to the payment of his debt." (p. 42)

In Jones v. Jones, supra, the Court said that the Maine system authorizing an execution to run against the body

"seeks only to obtain a discovery of the debtor's property and its situation, in order that the creditor may be the better enabled to satisfy his judgment out of such property." (p. 119, 32 A. p. 780).

In Karam v. Marden, supra, the Court addressed attention to the respective and mu-

---

2. Any interpretation which would permit the court to hold an "honest indigent" in jail and to disregard his inability to pay would be subject to serious constitutional doubts under the "equal protection of the laws" clause of the Fourteenth Amendment of the Constitution of the United States. The constitutional infirmity is shown by the recent decision of the United States Supreme Court in Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), holding that when a State has established a "fines only" policy for certain criminal offenses, such that interests as important as the *penological* concerns of the State are fulfilled by the imposition of *an obligation to pay money* (a fine), the State is prohibited by the equal protection of the laws clause from incarcerating the body of a defendant who is honestly too poor to pay either in satisfaction of the fine or to seek otherwise to coerce payment of it—at least until other methods available, such as providing "terms and conditions" consistent with the defendant's remaining free of incarceration while he is honestly indigent, are first utilized.

tual rights of the "creditor" and "debtor" and stated:

> "One object * * * was undoubtedly the commendable purpose of allowing the utterly indigent to be dismissed from prison, when incarcerated for debt.

> "Another was to furnish to the creditor knowledge of property of an imprisoned debtor, if such he had. These are important rights under the law; to the debtor a promise of liberty; to the creditor a pledge of restoration of property, under some circumstances." (p. 452, 148 A. p. 692).

Finally, in Vesanen v. Pohjola et als. supra, it was said:

> "* * * no longer in this state is arrest and imprisonment regarded as a satisfaction of the debt; imprisonment now is solely for the purpose of obtaining a discovery of the debtor's property." (p. 226, 36 A.2d p. 579)

■ These quotations reveal that the present law of Maine regarding the legitimate objectives served by executions which run against the body, and which operate as an essential governing factor in release proceedings under § 722, is the following:

(1) Maine has repudiated the common law principle by which a person who has been judicially adjudicated subject to a civil obligation to pay money is deprived of his liberty and imprisoned so that his *body* might be held as *satisfaction*, in whole or in part, of the obligation.

(2) The "creditor" who is thus deprived of the common law benefit of taking the body of his "debtor" in satisfaction is afforded in place thereof, and as an incident of an execution running against the body, *only* the right to a personal examination of the "debtor" in a hearing before a tribunal, *fairly selected and impartial, to ascertain* whether his "debtor" (a) has property out of which the obligation may be satisfied or (b) if the "debtor" lacks such property whether it is because he is honestly indigent or has dishonestly, or recalcitrantly, made his property unavailable.

■ (3) If the "debtor" has property and refuses to make it available for the satisfaction of the obligation, or has dishonestly made his property unavailable, and the "debtor" elects to refrain from furnishing an appropriate bond, the "creditor" has the right to have the body of the "debtor" incarcerated (14 M.R.S.A. §§ 3704, 3705). If, however, the "debtor" is *honestly indigent*, the "creditor" lacks the right to confine the body of the debtor, and the "debtor" has the right that his body be free of imprisonment regardless that the obligation will continue unsatisfied (14 M.R.S.A. §§ 3704, 3711, 3714, and 3715).

In the implementation of the foregoing policy the law of Maine, especially since 1885,[3] has differentiated among types of judgments which establish civil obligations to pay money. Judgments arising from claims founded "on a contract, express or implied, or on a prior judgment on contract" are distinguished from claims arising in other civil actions generally[4] (and commonly designated "actions of tort",) as well as other matters particularly covered by specific statutes and including the type of obligation with which we are presently concerned under § 722. As to the civil obligations to pay money originating "on a contract express or implied, or on a prior judgment on contract", upon failure by the "debtor" to pay the obligation, execution running against the body of the "debtor" is generally prohibited (14 M.R.S.A. § 3951). In other situations (generally "tort"), however, as well as in additional situations particularly delineated by statute, such as § 722, execution for failure of payment is authorized, summarily and without prior hearing as to the reasons for non-payment, to run

---

3. P.L. 1885, Chapter 137, the subject-matter of which is now contained in 14 M.R.S.A. § 3951.

4. 14 M.R.S.A. § 3701.

against the body as a preliminary device to initiate inquiry concerning the assets of the "debtor".

■ Appropriate to mention at this point is a unique characteristic of execution in general and, in particular, execution which runs against the body. Customarily, an execution is placed in the hands of the "creditor" to use at such time as he deems appropriate. Thus, when an execution running against the body is authorized and issued, the "creditor" has the power, at his election, to decide when the "debtor" shall be summarily arrested and placed in jail under the execution.

It was because § 722 authorizes an execution to run against the body of the petitioner, in relation to his civil obligation to pay money for counsel fees, *automatically and summarily* upon mere non-payment of the obligation (and that, pursuant to the statute, the court had so ordered) that the present petitioner was summarily subjected to arrest and imprisonment at a particular moment of time selected by the "creditor". At that time, however, petitioner was *in fact honestly without property* with which the obligation could be satisfied.

Under these circumstances a situation was developed in which petitioner, as an *honest indigent*, had a right,—under § 722 as well as in relation to capias executions generally,—that his body be free of liability to incarceration relative to his adjudicated obligation to pay money. Because he was honestly without property, the law of Maine exonerated his body from incarceration either to satisfy the monetary obligation or as a means otherwise to coerce payment. Yet, simultaneously, by virtue of § 722 which authorized an execution running against the body to be ordered and issued merely upon non-payment of the obligation (and regardless of the reason for non-payment), the creditor, at his will, summarily had petitioner arrested and placed in jail *before* petitioner was permitted to establish his honest indigency and,

therefore, his underlying right to be free of incarceration.

Thus is precipitated the constitutional issue which confronts us. The question is the constitutional validity of the sweep of § 722 as tested by the due process or equal protection of the laws clauses of the Fourteenth Amendment of the Constitution of the United States, insofar as § 722 authorizes the *summary* arrest and incarceration of persons solely because they have failed to satisfy, in whole or in part, a civil obligation to pay money as counsel fees for a divorce, no hearing prior to incarceration being afforded as to the reasons for the non-payment.

To paraphrase language of Sniadach v. Family Finance Corp., 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), what happens by virtue of § 722 and a court judgment thereunder ordering issuance of "capias" execution because of non-payment is that the Clerk of the Court issues the capias execution, running against the body of the "debtor", at the request of the "creditor", or his lawyer, and the "creditor", or his lawyer, then sets in motion, at will, the machinery whereby "debtor" is summarily arrested and imprisoned. It may be true that the "debtor" *subsequently* will be released from incarceration if he shows at the *subsequent* court hearing that the reason for the non-payment of the adjudicated obligation was his honest indigency. In the meantime, however, the "debtor" has been deprived of *his liberty and subjected to the humiliation of being kept in jail*, having been denied prior opportunity to be heard and show circumstances by virtue of which he would have the right to be out of jail.

The case at bar is a concrete instance of the jeopardy to personal liberty which inheres in the over-breadth of the net cast by the body execution authorization of § 722. Here, the petitioner had failed to pay his obligation because he was honestly indigent. Yet, regardless of his honest lack of ability to pay, § 722 authorized, and result-

ed in, his prior summary arrest and incarceration as a precondition of his being permitted to show that he was honestly indigent and that, therefore, his body *was free of liability to incarceration*, (in spite of the non-payment of the obligation).

■ Because (1) we believe that the circumstances of the present case reveal an absence of facts establishing an "extraordinary situation" necessitating the summary deprivation of the liberty of the petitioner as a "special protection" to an overridingly compelling State interest and (2) we find that the body, or "capias", execution authorization of § 722 for non-payment of attorney's fees broadly and sweepingly allows summary arrest and incarceration merely for non-payment and regardless of the reason for non-payment,—being thus unrestricted rather than narrowly drawn to meet a specific special and extraordinary situation which might be deemed to require summary incarceration without prior hearing—we hold such provision of § 722 to be without legal effect and void, as a deprivation of personal freedom without the procedural due process of law demanded by the Fourteenth Amendment of the Constitution of the United States.

■ We commence analysis by further paraphrasing Sniadach v. Family Finance Corp., 395 U.S. 337, 340, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969)—a case which we consider most significant for present purposes. A procedure may satisfy due process for *execution in general* and yet fail to satisfy procedural due process in every case. Thus, procedures which might meet due process requirements for executions against *property* can fail to satisfy procedural due process for executions *running against the body* which take from a person that which is most sacred to him, his personal liberty, and which subject him to the degradation of incarceration in a jail. Furthermore, as Mr. Justice Harlan observed in his concurring opinion in Williams v. State of Illinois, 399 U.S. 235, 90

S.Ct. 2018, 26 L.Ed.2d 586 (1970), a Court must

"squint hard at any legislation that deprives an individual of his liberty—his right to remain free." (p. 263, 90 S.Ct. p. 2033)

■ If it is a violation of procedural due process, because of the special type of hardship involved, summarily to deprive a person of his wages temporarily and as a preliminary to the ascertainment of whether *property is ultimately within a creditor's power to take*,—as Sniadach v. Family Finance Corp., supra, has decided—it would seem an *a fortiori* conclusion that procedural due process forbids the summary taking of a person's liberty, his body—his most precious possession—temporarily and as a preliminary to the ascertainment of whether it is the right of the "creditor" *ultimately to take the body of the person and keep it incarcerated*.

An alleged distinction that *Sniadach* involved the seizure of wages before adjudication of the legality of the "creditor's" asserted claim whereas execution against the body follows an adjudication that there exists a legally valid obligation in favor of the "creditor" is, in our opinion, untenable.

■ That petitioner might have been afforded the opportunity under § 722 to have his day in court on the merits of whether an obligation to pay money shall be imposed in the first instance, or whether once imposed it remains unpaid, is insufficient to eliminate the need of an additional hearing, as to *the reasons for non-payment*, especially when the non-payment can, as here, be the result of inability to pay. The law of the State of Maine (1) forbids the taking of a person's body and confining it in jail *in satisfaction* of the obligation and (2) prohibits the incarceration of his body *as a means to coerce payment* when, as in the instant case, the person is honestly indigent and, therefore, lacks the power to pay. These circum-

stances—honest indigency constituting inability to pay—are *new facts* which are material to the right of the person, (as in the situation with petitioner) to remain out of jail regardless of the existence, and nonpayment, of his civil obligation to pay money. Furthermore, these new facts—the honest lack of property and consequent inability to pay—are without necessary logical relationship to the adjudication of the existence, and imposition, of the obligation to pay in the first instance.

■ It is irrelevant, therefore, that a capias execution follows prior adjudication of the *existence* of the obligation to pay money. Since the *failure to pay* the obligation requires further adjudication as to new facts before the body of the debtor can be legally available, in the ultimo, to be subjected to incarceration for the benefit of the "creditor", procedural due process—absent compelling special circumstances—requires that the "debtor" be given a hearing as to these new facts before he can be deprived of his liberty.[5]

■ Thus, in light of the decision in *Sniadach* the State is required to show a special compelling interest, which necessitates the unusual encroachment upon personal liberty inhering in the summary arrest and incarceration of a husband merely because he has failed to satisfy an adjudicated obligation to pay attorney's fees in relation to his wife's divorce for his fault. The same requirement is shown by the recent case decided by the United States Supreme Court in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

See also: Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), deciding that welfare benefits may be terminated, consistently with due process, only upon a prior hearing offered to the welfare recipient.

■ The State purports to find a compelling interest to justify the summary incarceration involved in this case, and as authorized under § 722, by asserting that § 722 reflects a strong interest of society "that the family be maintained first of all by meat and bread" and that the attorney's fees of a wife claiming a right to divorce for the fault of her husband is, indirectly, "a form of support". Even if we accept this contention, that payment of attorney's fees to enable a wife to procure a divorce is indirectly a form of "support" for her, the argument of the State lacks cogency. To the extent that § 722 makes irrelevant the reason for non-payment of the "support" and thereby is sufficiently broad to authorize summary incarceration of persons who are *truly powerless* to provide "support" because of honest indigency—as the instant case strikingly demonstrates,—a

[5.] For this reason the present situation is manifestly distinguishable from Endicott Johnson Corporation v. Encylopedia Press, Inc., 266 U.S. 285, 45 S.Ct. 61, 69 L.Ed. 288 (1924) in which the United States Supreme Court held that the opportunity of a defendant to appear and contest the entry of the judgment which adjudicated his civil obligation to pay money is sufficient to render unnecessary further hearing before resort to an execution by which *property* of the "debtor" is summarily applied in *satisfaction* of the obligation. The fact that property of the debtor was available immediately eliminates the factor of indigency. The fact that the property could properly be applied under the State law in satisfaction of the obligation immediately distinguishes the present situation in which the State law prohibits the body of a human being from being applied in satisfaction of a civil obligation to pay money.

In addition, the law of Maine has already demonstrated that summary incarceration of the body is unnecessary, and is eliminated, when a judgment is procured for an obligation to pay money founded on a "contract, express or implied, or on a prior judgment on contract" (14 M.R.S.A. § 3951) and is unpaid. In this manner, the State has itself recognized that the failure to satisfy a civil obligation to pay money merely because it has been adjudicated to exist and is unsatisfied is insufficient, *by itself*, to affect a concern which the State deems sufficiently vital to warrant summary arrest and incarceration of the person.

State interest of ensuring family support is unfulfilled by summary incarceration. It is more likely to be defeated since during the period of incarceration the person intended by the State to be the family "provider" is denied any opportunity to make himself able to be a provider, cf. Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L. Ed.2d 130 (1971). The statute thus cuts a swath much beyond the legitimate necessity of the State's interest to ensure family support and maintenance.

Furthermore, there is missing a rationally close connection between mere non-payment of "support" and those special factors which the law of Maine recognizes as justifying incarceration of the body relative to adjudicated civil obligations to pay money—availability of assets and refusal to allow their use for payment, or the dishonest manipulation of assets to make them unavailable. Mere non-payment of "support" fails to yield a rational conclusion that the non-payment probably resulted from dishonest handling of assets or obstinate refusal by "debtor" to make assets, which he in fact has, unavailable to satisfy the obligation of "support". Thus, a compelling State interest requiring incarceration prior to hearing is absent *generally* under § 722; and in the particular circumstances of the present case, in which the petitioner prior to the adjudication of the obligation to pay attorney's fees had made intermittent payments to the attorney on account of counsel fees which were discontinued, apparently when the petitioner became unemployed, there is an absence of a specific showing that petitioner's subsequent non-payment of the adjudicated obligation involved any tendency to be either dishonest in his handling of property or recalcitrant in making it available for satisfaction of his obligation to the attorney.[6]

The Attorney General has argued that due process requirements are met to the extent that § 722 confers upon petitioner, *after* he has been incarcerated, the right to be released from such incarceration as soon as he shows the Court that he is honestly without property with which to satisfy his civil obligation to pay money. Under the circumstances here adduced, the petitioner was entitled by the law of the State, as an honest indigent, to have his body free of incarceration even though he was subject to an adjudicated civil obligation to pay money which might remain unsatisfied. His circumstances, therefore, were such that he was entitled to be out of jail. Only by providing him a hearing *before* incarcerating him, and thereby depriving him of precisely that liberty of his body which a hearing would prove to be his right, can the mandate of the due process clause of the Fourteenth Amendment of the Constitution of the United States be met. The enormity of the violation of personal liberty incident to prior incarceration in a jail as a precondition of a person's opportunity to demonstrate a right to be out of jail is intolerable under the due process clause—when a hearing before such incarceration is practicable and easily afforded by the State without detriment to any of its vital interests.

Under these circumstances, the availability of a procedure after incarceration by which the petitioner may be re-

---

6. There might be a rational basis for requiring summary incarceration of a "debtor" after judgment, under a body execution, if the "debtor" prior to judgment had been arrested pursuant to 14 M.R. S.A. § 3601 because he had been "about to depart and reside beyond the limits of the State with property or means of his own exceeding the amount required for his immediate support". In this exceptional and particularized situation it could be argued that a tendency had been manifested to seek to deprive the "creditor" of assets from which he would be entitled to satisfy his judgment, and that in light of such tendency the State's interest in protecting the right of the "creditor" might be sufficiently compelling to justify summary arrest of the judgment "debtor" for non-payment of the judgment rendered and even though the "debtor" had given a bond prior to judgment. (14 M.R.S.A. § 3653)

leased from a confinement, to which it eventuates that he was not subject and which could have been avoided by a hearing prior to incarceration, is inadequate to salvage the statute. Desmond v. Hachey, 315 F. Supp. 328, 333 (D.C.1970); In re Harris, 69 Cal.2d 486, 72 Cal.Rptr. 340, 446 P.2d 148 (1968). See: Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).[7]

■ Furthermore, since due process normally requires hearing before incarceration, it is irrelevant that, as the Attorney General suggests, a person who is confined in jail need stay in jail under § 722, only "a few hours to a few days" depending upon when the next session of the committing court will take place and at which the right to be free can be established. When, as in relation to § 722, generally, and in the particular circumstances of this case, the State has failed to demonstrate a compelling governmental interest which necessitates preliminary incarceration pending inquiry into the status of the assets of the

"debtor", procedural due process, as embodied in the Fourteenth Amendment of the Constitution of the United States, holds indefensible the affront to human dignity which inheres in summary incarceration in a jail, regardless of the brevity of time; it is an intolerable debasement of the "values of a free society". See: Boddie v. Connecticut, 401 U.S. 371, at p. 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

The provisions of § 722 which authorize a summary body execution for non-payment of an adjudicated obligation to pay attorney's fees, without opportunity of the "debtor" to have a prior hearing on the reasons for non-payment,—(and even if attorney's fees to allow a wife to procure a divorce for her husband's fault be deemed to be an indirect form of "support" for her)—is a violation of the due process clause of the Fourteenth Amendment of the Constitution of the United States. The provision is, therefore, null and void, and the body ("capias") execution by which petitioner in the present case was arrested and committed is likewise a nullity.[8] The

7. The same conclusion is implicit in the decision of the United States Supreme Court in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). In Baxstrom a New York statute was under consideration which provided that when a prisoner who had been placed in a mental hospital approximately two years after he had started serving his sentence was approaching the end of his sentence the State could have him committed to a mental hospital without a prior hearing in which the propriety of such confinement could be ascertained. The State of New York sought to justify the constitutional validity of the statute by arguing that habeas corpus to accomplish release after commitment was a sufficient protection to satisfy constitutional requirements. As has been noted in Cameron v. Mullen, 128 U.S.App.D.C. 235, 387 F.2d 193 (1967), in the light of this contention in Baxstrom that habeas corpus could afford release after confinement, "the Court must have concluded that habeas corpus was no substitute for a full hearing, for the Court did not mention that remedy, although New York had urged it as an adequate safeguard." (p. 201) It is

reasonable, therefore, to conclude that *Baxstrom v. Herold* sustains the view that when the constitution requires a full hearing before confinement, the availability of a procedure subsequent to confinement to achieve restoration of personal liberty is insufficient to meet constitutional standards.

8. That summary arrest and incarceration of persons under civil obligations to pay money has been established practice under Maine law in many general situations and in other specific instances similar to § 722 fails to insulate the procedure against invalidation under the due process clause of the United States Constitution (Fourteenth Amendment) when, as here, a compelling State interest necessitating the summary procedure is lacking. As was said by Chief Justice Burger in Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) "new cases expose old infirmities which apathy or absence of challenge has permitted to stand. But * * * constitutional imperatives * * * must have priority over the comfortable convenience of the status quo." (p. 245, 90 S.Ct. p. 2024)

petitioner was unlawfully arrested and was illegally incarcerated and held in the Cumberland County jail. He is entitled to his freedom.

A final word is in order regarding the scope of the decision in this case. Nothing herein decided, or stated, is intended to deprive a court of its powers of *contempt,* in accordance with appropriate procedural guarantees, to ensure compliance with any order or decree, by whatever label designated, issued by the court. Of course, contempt by its very nature is inapplicable to one who is powerless to comply with the court order. It would be utilized against only that person who, being able to comply, contumaciously disobeys, or refuses to abide by, the court order.

It is likewise important that comment be added regarding the provisions of 14 M.R.S.A. § 252 which relate to the general subject of contempt when "the process, decree or order of court" is found to have been "disregarded or disobeyed by any person" but which excludes from its coverage a process, decree or order of court "which is * * * for the payment of money only".

Although this section now appears in the Revised Statutes under a general classification of "Contempt", rather than "Equity", the decision of Cushman Co. et al. v. Mackesy et al., 135 Me. 490, 200 A. 505 (1938) makes unmistakably clear that the section is only one aspect of the clarification and codification first enacted in 1881 (P.L.1881, Ch. 68) of the general procedures which are to guide *equity* practice. The Maine legislature saw fit to undertake such project seven years after, in 1874, by legislative action full equity jurisdiction was given to the Supreme Judicial Court (over and above the specific situations in which equity jurisdiction had already been granted) "in all * * * cases where there is not a plain, adequate and complete

remedy at law." (P.L.1874, Ch. 175). Thus, the exclusion of a process, decree or order "which is * * * for the payment of money only" would seem to have been inserted under the apprehension that equity jurisdiction would normally be unconcerned with ordering "the payment of money only", since such a remedy for money only would generally be forthcoming as an incident of jurisdiction *at law* rather than in equity.

In any event, as Cushman v. Mackesy, supra, stresses, the power of a court to enforce compliance with any decree or order issued by it "has existed from earliest times" (p. 494, 200 A. p. 508) and the power must be held inherent in the very establishment of a court since "it was useless to establish courts unless they had authority to punish acts which might interrupt the orderly course of judicial procedure; and it was likewise futile to confer jurisdiction to issue orders * * * without the power to enforce obedience to such decrees." (p. 494, 200 A. p. 508)

The provisions of 14 M.R.S.A. § 252 are, therefore, a compendium of provisions the purpose and scope of which are to delineate, in a directory manner, appropriate procedures to be generally used in contempt proceedings primarily in cases sounding in equity and which may likewise be a guide for contempt proceedings in any other type of case. The language of 14 M.R.S.A. § 252 is without design, however, to delineate *exclusive or exhaustive* compass of the *inherent* contempt powers of a court. Neither does it impose *substantive* limitations upon the existence of such inherent contempt powers in relation to a process, decree or order of a court, by whatever name labelled, and which would impose an obligation to pay money only. Hence, contempt is available to a court to enforce its process, decree or order even when the payment of money only is involved.

In the present case, the petitioner for habeas corpus has been illegally incarcerated and restrained of his liberty.[9]

The entry is:

Petitioner discharged.

9. Our decision renders unnecessary consideration of an issue raised by petitioner that a person found to be indigent is entitled to appointed counsel at any hearing the purpose of which is to determine whether an execution running against the body shall be issued.

Since the ramifications of this question are manifold, the evaluation of it should properly await an actual case in which it is squarely presented. Should it be correct, as petitioner has argued in the present case, that the designation of the hearing as "criminal" or "civil" is without controlling effect (and we intimate no opinion on the validity of the contention), it could likewise be correct that an approach which seeks to make potential loss of liberty the sole determinant is oversimplified and ignores other material factors which must be involved in the ultimate decision of the question.