STATE EX REL. KOVACH, Petitioner, v. SCHUBERT, Superintendent, Central State Hospital, Respondent.

*No. State 238. Argued May 8, 1974.—Decided July 3, 1974.*
(Also reported in 219 N. W. 2d 341.)

613

614

For the petitioner there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the respondent the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

WILKIE, J. The issue presented is: Does sec. 971.17 (1) and (2), Stats., deny to the petitioner due process of law and the equal protection of the law in violation of the fourteenth amendment to the United States Constitution?

The petitioner challenges the provisions of sec. 971.17, Stats., which provide for automatic commitment upon a finding of not guilty by reason of mental disease or defect without an adjudication of insanity at the time of commitment and the provisions for release which place upon the petitioner the burden of proving that he is now sane and that he may safely be discharged or released without harm to himself or others.

*Equal protection as to commitment procedures.*

Commitment proceedings are civil and benevolent and thereby independent, to a certain extent, of the constitutional safeguards applied to deprivations of liberty involved in criminal proceedings. However, the trend in recent years has been toward a more rigorous protection of individual rights.

In 1966, in *Baxstrom v. Herold*[3] the United States Supreme Court held that a prisoner completing his sentence could not be committed without affording him all the procedural protections provided to other citizens involuntarily civilly committed. The court found that there "is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments" and that, therefore, the statutory scheme under scrutiny in that case denied to the petitioner the equal protection of the law.

The next year, in *Specht v. Patterson*,[4] the supreme court held that a prisoner committed under the Colorado

---

[3] (1966), 383 U. S. 107, 112, 86 Sup. Ct. 760, 15 L. Ed. 2d 620.
[4] (1967), 386 U. S. 605, 87 Sup. Ct. 1209, 18 L. Ed. 2d 326.

Sex Offenders Act was entitled by the due process clause to a hearing where he would be present with counsel, have an opportunity to be heard, to be confronted with witnesses against him, to have the right of cross-examination and to offer evidence in his own behalf, and to have findings made which would be adequate for review. Wisconsin had already required such a hearing under its sex deviate statutes.[5]

In *Bolton v. Harris*,[6] the Court of Appeals for the District of Columbia applying the principles of *Baxstrom* declared that persons found not guilty by reason of insanity must be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings. That court felt the *Baxstrom Case* indicated that the commission of criminal acts does not give rise to a presumption of dangerousness which, standing alone, justifies substantial differences in commitment procedures and confinement conditions of the mentally ill.

In *State ex rel. Schopf v. Schubert*[7] the Wisconsin court was faced with a challenge to its statute providing for automatic commitment of persons found not guilty by reason of insanity. With a divided court, this court found that such a scheme did not deny equal protection of the law to such persons. The court confined the *Baxstrom Case* to its facts and found it distinguishable from the provision of different procedures for civil versus criminal commitments. The court further held that the expansive interpretation of the holding of *Baxstrom* found in *Bolton v. Harris* was based on erroneous reasoning.

In *Jackson v. Indiana*,[8] the United States Supreme Court (in 1972) was faced with another challenge to a state commitment procedure. This time the validity of

---

[5] *Huebner v. State* (1967), 33 Wis. 2d 505, 147 N. W. 2d 646.

[6] (D. C. Cir. 1968), 395 Fed. 2d 642.

[7] (1970), 45 Wis. 2d 644, 173 N. W. 2d 673.

[8] (1972), 406 U. S. 715, 92 Sup. Ct. 1845, 32 L. Ed. 2d 435.

procedures for the commitment of persons found incompetent to stand trial were under scrutiny. The supreme court found that due process requires that the nature and duration of commitment bear some reasonable relation to the purpose of the commitment. Therefore, the court mandated that persons charged with criminal offenses who are committed solely on account of their incapacity to stand trial cannot be held more than the reasonable time necessary to determine whether there is a substantial probability of their attaining that capacity in the foreseeable future. If there is no such probability such persons must be released or proceedings for civil commitment commenced. This mandate has been carried out by this court.[9]

However, another aspect of the *Jackson Case* has not received similar attention. The supreme court also found that the petitioner had been denied the equal protection of the law by being subjected to more lenient commitment standards. The petitioner did receive a hearing at which he was represented by counsel. However, the supreme court found that the procedure under which he was committed was substantially different from that afforded to persons committed as insane or feebleminded. The court stated:

". . . *Baxstrom* held that the State cannot withhold from a few the procedural protections or the substantive requirements for commitment that are available to all others."[10]

The court also said:

". . . The *Baxstrom* principle also has been extended to commitment following an insanity acquittal, *Bolton v. Harris,* 130 U. S. App. D. C. 1, 395 F. 2d 642 (1968);

[9] *State ex rel. Matalik v. Schubert* (1973), 57 Wis. 2d 315, 204 N. W. 2d 13; *State ex rel. Haskins v. Dodge County Court* (1974), 62 Wis. 2d 250, 214 N. W. 2d 575.

[10] *Jackson v. Indiana, supra,* footnote 8, at page 727.

*Cameron v. Mullen,* 128 U. S. App. D. C. 235, 387 F. 2d 193 (1967) ; *People v. Lally,* 19 N. Y. 2d 27, 224 N. E. 2d 87 (1966), and to commitment in lieu of sentence following conviction as a sex offender. *Humphrey v. Cady,* 405 U. S. 504 (1972)." [11]

In its brief here the state discounts this apparent approval of these cases. We believe that the significance of this approval cannot be ignored. The court was obviously doing more than merely citing these cases for informational purposes. If that was their only significance they could have been placed in a footnote. The conclusion that the United States Supreme Court is approving of the application of the *Baxstrom* "principle" in these cases cannot be avoided.

Under the Indiana statutes (in *Jackson v. Indiana*) the state needed only to show that the petitioner was unable to stand trial and the supreme court was unable to say that, on the record before them, Indiana could have civilly committed the petitioner as either insane or feebleminded under the standards applied to those groups. The United States Supreme Court found that subjecting the petitioner to a more lenient commitment standard than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing necessary for commitment afforded by the civil statutes of Indiana denied to the petitioner the equal protection of the laws under the fourteenth amendment.

In *Humphrey v. Cady,*[12] involving Wisconsin litigants, the United States Supreme Court discussed, although did not actually decide, constitutional issues involving the differing procedures afforded persons civilly committed and those committed as "sex deviates" under the statutes of Wisconsin. The petitioner in that case asserted that the original and renewal provisions of the

[11] *Id.* at pages 724, 725.
[12] (1972), 405 U. S. 504, 92 Sup. Ct. 1048, 31 L. Ed. 2d 394.

Wisconsin Sex Crimes Act were unconstitutional because such commitments were essentially equivalent to Wisconsin's Mental Health Act which provides for jury determination and his commitment without a jury trial thus deprived him of equal protection.

The United States Supreme Court found that Wisconsin for almost a hundred years has relied on a jury to decide whether to civilly commit a person for compulsory psychiatric treatment:

". . . Wisconsin conditions such confinement not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." [13]

The supreme court felt that compulsory treatment under the Sex Crimes Act appeared to require the same kind of determination and raised the question of whether that being so any justification existed for depriving persons committed under the Sex Crimes Act of the jury determination afforded to persons committed under the Wisconsin Mental Health Act. The court indicated that if commitment under the Sex Crimes Act were not merely an alternative to sentencing there would probably exist no arguable justification for such difference in procedure.

Prior to the *Humphrey Case* the Wisconsin Supreme Court had rejected constitutional challenges to the Sex Crimes Act. In *Buchanan v. State* [14] this court rejected a claim that equal protection required a jury trial under the Sex Crimes Act, as was provided under the Mental Health Act. This court found:

"There are several germane distinctions to the classification, as seen above—the most important is that a sexual deviate is confined because he is dangerous to the

---

[13] *Id.* at page 509.
[14] (1969), 41 Wis. 2d 460, 164 N. W. 2d 253.

public, and the mentally ill, infirm or deficient person is confined primarily for his own benefit and treatment." [15]

However, in *State ex rel. Farrell v. Stovall* [16] the Supreme Court of the United States remanded two matters involving constitutional challenges to the Sex Crimes Act to the Wisconsin court for reconsideration in light of the supreme court decisions in *Humphrey v. Cady* and *Jackson v. Indiana.* On remand this court determined that in fact no rational basis existed justifying the difference in the rights afforded to persons committed under the Sex Crimes Act and to those committed under the Mental Health Act. This court found:

". . . While the *Buchanan* decision recognized the Acts were distinguishable in terms of their primary emphasis —the confining of the sex deviate chiefly due to the potential danger to the community, and the confining of the mentally ill person chiefly for his own benefit and treatment, the pervading theme of both Acts is undeniably treatment of the individual and protection of the community.

". . . The only meaningful difference between the two Acts, apart from the slightly different emphasis noted in *Buchanan,* is the sex crimes statute's inapplicability except where one's mental illness or 'aberration' has already led him to the commission of a sex crime and conviction therefor." [17]

This court finding the scope and purpose of the statutes virtually identical had to decide whether any rational basis existed for distinctions in the procedure required for commitments under either. The court found that:

". . . Such justification, as pointed out by the United States Supreme Court in *Baxstrom v. Herold* and *Humphrey v. Cady,* requires more than an individual's prior criminal record:

---

[15] *Id.* at page 472.

[16] (1973), 59 Wis. 2d 148, 207 N. W. 2d 809.

[17] *Id.* at page 162.

" '. . . The court [in *Baxstrom*] recognized that the prisoner's criminal record might be a relevant factor in evaluating his mental condition, and in determining the type of care and treatment appropriate for his condition; it could not, however, justify depriving him of a jury determination on the basic question whether he was mentally ill and an appropriate subject for some kind of compulsory treatment.' " [18]

This court found that commitments under the Sex Crimes Act were not merely sentencing alternatives but independent of the convictions from which they arose and therefore the only meaningful difference between the two acts was a slightly greater emphasis on public safety under the Sex Crimes Act. This emphasis, however, was not sufficient to justify the differences in procedure under the two acts.

Because of the cases subsequent to our decision in *State ex rel. Schopf v. Schubert,* we now find that the automatic commitment of persons found not guilty by reason of insanity is a denial to such persons of the equal protection of the laws.

Following a finding of not guilty by reason of mental disease or mental defect, there should now be another question submitted to the jury on whether the defendant is presently suffering from mental illness [19] and is in need of institutionalized treatment. These are the determinations that must be made in connection with a commitment under ch. 51, Stats. To answer such a question, the jury would have to be provided with proof based on examination of the defendant in his then condition. If the answer to this further question is "Yes," then the court shall commit the defendant in accordance with sec. 971.17 (1).

[18] *Id.* at page 164.
[19] Sec. 51.75, Art. II (f), Stats.

*Due process in proceedings for commitment.*

We also conclude that the procedure under sec. 971.17, Stats., for the automatic commitment of a defendant upon a finding of not guilty by reason of mental disease or mental defect constitutes a denial of due process in its denial of a hearing and finding of present insanity at the time of the commitment.

*Jackson v. Indiana* does not justify an automatic commitment without a hearing. That case merely holds that the duration of commitment must bear a reasonable relation to the purpose of the commitment. It does not stand for the proposition that commitment can be without a hearing. The petitioner in *Jackson* did have an adjudication of incompetency before being committed.

To satisfy due process, the finding of present mental illness should be made after a full hearing on a defendant's present condition.

*Challenge to re-examination procedures.*

Whereas the provisions of sec. 971.17 (2), Stats., spelling out the procedure for a re-examination of a defendant's mental condition, provide for a general procedure following sec. 51.11, neither sec. 971.17 nor ch. 51 designates who has the burden of proof at a re-examination hearing under ch. 51. Normally, the petitioner carries the burden of persuasion in any judicial proceeding, so that the burden would be on the defendant to persuade the reviewing court that he could be released.[20]

There is no denial of equal protection or of due process in placing the burden of showing that a defendant can be

[20] *See* 56 Nw. U. L. Rev. (1961), 409, 452, note 144 and cases in note 135; *Loeb v. Board of Regents* (1965), 29 Wis. 2d 159, 164, 138 N. W. 2d 227.

released with safety on that defendant, since the burden under sec. 971.17 (2), and under sec. 51.11 is the same. It does not shock the conscience to place this burden on this defendant since ch. 51 provides that the court must appoint two psychiatrists to examine the patient who applies for re-examination and thus the patient is not completely without assistance.

### Prospective ruling.

Because the present petitioner has been committed to the Central State Hospital and has unsuccessfully sought release in several re-examinations, and the same opportunity for re-examination has been available to every criminal defendant committed automatically under sec. 971.17 (1), Stats., following a finding that he was not guilty by reason of mental disease or defect at the time of the alleged offense, we completely prospect this ruling and do not apply it to the petitioner's case. In other words, this ruling governs prosecutions not yet instituted or completed.

Because of our ruling herein, the recommended instruction on the effect of a verdict of "not guilty by reason of mental (*disease*) (*defect*) (*disease or defect*)" [21] must be modified to reflect the fact that on such a finding the jury will be asked as to whether the defendant is presently mentally ill and whether he is a proper subject for custody and treatment. [22]

*By the Court.*—The provisions of sec. 971.17 (1), Stats., providing for automatic commitment without a hearing to determine present mental state and need for commitment, violate the equal protection and due process

---

[21] Wis J I—Criminal, Part I, 655–CPC. *See State v. Shoffner* (1966), 31 Wis. 2d 412, 428, 429, 143 N. W. 2d 458; *Lyles v. United States* (D. C. Cir. 1957), 254 Fed. 2d 725; *McDonald v. United States* (D. C. Cir. 1962), 312 Fed. 2d 847.

[22] Secs. 51.02 (5) (c) and 971.17 (2), Stats.

clause of the United States Constitution; determination of present mental illness shall be made in all prosecutions either pending or not instituted; other relief denied to this petitioner.

ROBERT W. HANSEN, J. (*dissenting*). In this state, by statute, when a defendant in a criminal case is found not guilty by reason of insanity at the time of an offense, he is committed to a state treatment facility until ". . . he may safely be discharged or released without danger to himself or others. . . ." [1] The claim here is that this statute violates both equal protection of the law and due process of law. Analysis of such challenge requires initial analysis of the purpose of such insanity acquittal commitment.

*Purpose of commitment.* What public purpose is served by such commitment of a defendant found not guilty by reason of insanity? The purpose served is two-fold: (1) Protection of the public; and (2) treatment and rehabilitation of the defendant.[2] More is involved than treating the sick until well.[3] Not only is therapy

---

[1] Sec. 971.17 (2), Stats.

[2] *Treglown v. H&SS Department* (1968), 38 Wis. 2d 317, 325, 326, 156 N. W. 2d 363, holding that ". . . the purpose of detention under a statute providing for commitment of a person acquitted of crime by reason of insanity '. . . is not punitive but rather serves a two-fold purpose: (1) to protect the public and the subject, and (2) to afford a place and procedure to treat and, if possible, to rehabilitate the subject.'" (Quoting *Collins v. Cameron* (D. C. Cir. 1967), 377 Fed. 2d 945, 947.)

[3] *Id.* at page 325, this court stating of predecessor statute with likelihood of recurrence rather than the safety of himself and others the test for release: "It is clear that the intent and result of this statutory enactment is not only to authorize but to direct continued confinement under this section beyond the full recovery of the patient until it is established that 'he is not likely to have a recurrence of insanity or mental irresponsibility.' This goes beyond treating the sick until well. It directs confinement until society is reassured that reccurence of insanity or mental irrespon-

for the defendant involved, but also ". . . proper custodial handling so that the community is protected from individuals who may be dangerous to other persons." [4] It is this factor of protecting the public safety that places the ". . . emphasis upon confinement until the public safety justifies release . . . ." [5] Realizing the twofold objective of the commitment, this court has made clear the ". . . primary importance of the public safety factor involved in the automatic confinement of a defendant acquitted on the grounds of insanity . . . ." [6]

*Status of defendant.* When a defendant on a criminal charge has been found not guilty by reason of insanity, what has happened? Our court has said that: "When a mentally ill person engages in offensive conduct made punishable by law, society is faced with the question whether at the time of engaging in the offensive conduct the accused was dominated or affected by the mental illness to so substantial a degree that society cannot, in good conscience, hold him responsible for the conduct as a crime, *i.e.*, punish him. . . ." [7] The answer to that question, we have held, is that ". . . [t]he legislature and the judiciary, by making general rules, and the jury by its verdict in a specific case must, in combination, provide the answer. . . ." [8] That answer, measuring the degree of relationship between the mental illness of the defendant and his offensive conduct, is a legal

sibility will not result in acts which but for insanity or mental irresponsibility would be crimes."

[4] *State ex rel. Schopf v. Schubert* (1970), 45 Wis. 2d 644, 652, 173 N. W. 2d 673, this court stating: "There is a twofold objective in dealing with prisoners who have been adjudicated not guilty by reason of insanity: (1) Therapy for the mental disease from which they were suffering at the time of the crime, and (2) proper custodial handling so that the community is protected from individuals who may be dangerous to other persons."

[5] *Treglown v. H&SS Department, supra,* footnote 2, at page 327.

[6] *Id.* at page 326.

[7] *State v. Esser* (1962), 16 Wis. 2d 567, 585, 115 N. W. 2d 505.

[8] *Id.* at page 585.

and not a medical concept.[9] In the case before us, the petitioner asserted such legal defense of insanity and was found not guilty by reason of such insanity. He thus became a member of what has been termed "an exceptional class of people—people who have committed acts forbidden by law, who have obtained verdicts of 'not guilty by reason of insanity.'"[10] It is a class or category that is distinct and different from persons committable in civil commitment proceedings for purpose of treatment only.[11] It is a class or category also distinct and different from those who are found incompetent to stand trial in judicial proceedings,[12] or those, nearing the end of a

[9] *Id.* at page 586, this court stating: "Almost universally, however, the courts provide a standard by which the jury is instructed to measure whether the degree of relationship between the mental illness of the accused and his offensive conduct is sufficient to relieve him from responsibility. We refer to this standard as the definition of the defense of insanity. It is not a definition of mental illness or medical insanity, but a definition of the defense, a legal and not a medical concept."

[10] *Overholser v. Leach* (D. C. Cir. 1958), 257 Fed. 2d 667, 669, certiorari denied (1959), 359 U. S. 1013, 79 Sup. Ct. 1152, 3 L. Ed. 2d 1038, stating of insanity acquittal commitment statute: "This statute applies to an exceptional class of people—people who have committed acts forbidden by law, who have obtained verdicts of 'not guilty by reason of insanity,' and who have been committed to a mental institution pursuant to the Code. People in that category are treated by Congress in a different fashion from persons who have somewhat similar mental conditions, but who have not committed offenses or obtained verdicts of not guilty by reason of insanity . . . ." (Quoted in *Ragsdale v. Overholser* (D. C. Cir. 1960), 281 Fed. 2d 943, 946.)

[11] *Id.* at page 669, the court stating: "The test of this [insanity acquittal commitment] statute is not whether a particular individual, engaged in the ordinary pursuits of life, is committable to a mental institution under the law governing civil commitments. Cf. Overholser v. Williams, 1958, 102 U. S. App. D. C. 248, 252 F. 2d 629. Those laws do not apply here. . . ."

[12] *See: Jackson v. Indiana* (1972), 406 U. S. 715, 738, 92 Sup. Ct. 1845, 32 L. Ed. 2d 435, involving indeterminate commitment of feebleminded deaf mute as incompetent to stand trial, the court stating: "We hold, consequently, that a person charged by a State

prison term, for whom civil commitment is sought solely for the purpose of treatment until recovery.[13]

*Provisions for release.* It is the ". . . public safety requirements for his release . . ."[14] along with the ". . . nontreatment factors involved in his commitment . . ."[15] that sharply distinguish the purpose of an insanity acquittal commitment from a civil commitment. The statute governing civil commitment proceedings provides that ". . . the person is committed to a hospital for treatment until recovered . . ."[16] and that ". . . [r]ecovery from mental illness is the sole test for release. . . ."[17] In fact, under certain circumstances, a person civilly committed may be released before he is fully recovered from his mental illness.[18] It is the dif-

---

with a criminal offense who is committed *solely* on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. . . ." (Emphasis supplied.)

[13] *See: Baxstrom v. Herold* (1966), 383 U. S. 107, 86 Sup. Ct. 760, 15 L. Ed. 2d 620, where a prisoner nearing the end of his prison term was civilly committed by a procedure radically different from that used to civilly commit others. *See also: State ex rel. Schopf v. Schubert, supra,* footnote 4, the court stating at page 650: ". . . The only reason for this was that he was a prisoner about to complete his sentence" and concluding "The denial of equal protection arose as a result of providing two different methods of *civil* commitment and *with no reasonable basis for it.*" (Emphasis supplied.)

[14] *Treglown v. H&SS Department, supra,* footnote 2, at page 327.

[15] *Id.* at page 327.

[16] *Id.* at page 323.

[17] *Id.* at page 323.

[18] *Id.* at page 324, summarizing applicable statutes for discharge in civil commitments, stating: ". . . Sec. 51.11 (5), provides that the court may order discharge of a patient if it determines that he is no longer 'in need of care and treatment.' Under sec. 51.12 (4), the superintendent of any state or county hospital or mental health center, with the approval of the Department of Health and Social Services necessary outside of Milwaukee

fering statutory provisions concerning release or discharge that help establish the nature and purpose of the commitments involved, and the reasonable basis for distinguishing between them. As we stated in *Treglown*, it is ". . . [t]his emphasis upon release [in civil commitment proceedings] as soon as recovery or the welfare of the patient permits [that] establishes the nature and purpose of the confinement: treatment for the illness involved." [19] Not so with the petitioner here, for, as in *Treglown*, ". . . He was found not guilty by reason of insanity and was committed to the Central State Hospital *for the protection of the public* and for his rehabilitation and treatment, if possible." [20] (Emphasis supplied.)

*Equal protection of law.* The petitioner's contention is that only by some equivalent of civil commitment proceedings could he constitutionally be committed to a state treatment facility following his insanity acquittal. It is without merit. The equal protection clause disapproves only irrational and arbitrary classifications. [21] Equal protection of the law ". . . does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. . . ." [22] The difference in procedures for civil commitment and the insanity acquittal commitment are warranted by the

county, may discharge any patient who in his judgment is recovered or who is not recovered but whose discharge will not be detrimental to the public welfare or injurious to the patient. Under sec. 51.13 (1) and (2), the superintendents of certain state mental institutions may grant conditional releases to patients if, in their opinion, 'it is proper to do so,' or upon the written recommendation of the visiting physician. . . ."

[19] *Id.* at page 324.

[20] *Id.* at page 327.

[21] *See: McGowan v. Maryland* (1961), 366 U. S. 420, 81 Sup. Ct. 1101, 6 L. Ed. 2d 393.

[22] *Baxstrom v. Herold, supra,* footnote 13, at page 111. (Quoted in *State ex rel. Farrell v. Stovall* (1973), 59 Wis. 2d 148, 171, 207 N. W. 2d 809.)

obvious differences in the primary purpose of the commitments involved. Exactly as this court concluded in the *Schopf Case* on the precise point involved, the writer would conclude that: ". . . The classification made by the legislature in the instant situation between civil commitment and criminal commitment is neither irrational nor arbitrary, and, in fact, is perfectly reasonable. . . ." [23] As was appropriately said in *Schopf*, ". . . Concern for the general safety of the community requires at least this much. . . ." [24]

Counsel for petitioner disagrees, apparently viewing the United States Supreme Court decision in the *Jackson Case* [25] as washing away the foundation of our court's holding in *Schopf* on the equal protection issue. Neither the facts nor the holding in *Jackson* warrant any such conclusion. In *Jackson*, the high court dealt with incompetency to stand trial. The petitioner there was a mentally defective deaf mute, [26] committed to a mental hospital ". . . solely on account of this incapacity to proceed to trial . . . ." [27] He was there confined for three and one-half years, and medical testimony was that he never would be able to proceed to trial. [28] Under these

[23] *State ex rel. Schopf v. Schubert, supra,* footnote 4, at page 651.

[24] *Id.* at page 652.

[25] *Jackson v. Indiana, supra,* footnote 12.

[26] *Id.* at page 717, the court stating: "Petitioner, Theon Jackson, is a mentally defective deaf mute with a mental level of a preschool child. He cannot read, write, or otherwise communicate except through limited sign language. . . ." *Id.* at page 719, the court stating: ". . . [T]he trial court found that Jackson 'lack[ed] comprehension sufficient to make his defense,' . . . and ordered him committed to the Indiana Department of Mental Health until such time as that Department should certify to the court that 'the defendant is sane.'"

[27] *Id.* at page 738.

[28] *Id.* at pages 718, 719, the court stating: ". . . One doctor testified that it was extremely unlikely that petitioner could ever learn to read or write and questioned whether petitioner even had the ability to develop any proficiency in sign language. . . . The

circumstances,[29] the high court held that the mere filing of criminal charges, no more, did not warrant confining the petitioner for ". . . more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity [to proceed to trial] in the foreseeable future. . . ."[30] The commitment statute there involved required a showing of dangerousness, and the court held that ". . . the pending criminal charges are insufficient to establish it, and no other supporting evidence was introduced. . . ."[31] *Jackson* is to be distinguished from *Schopf* and the case before us by the purpose of the commitments involved and the status of the petitioners involved, as well as by the absence in the *Jackson* situation of the public safety factor.

In *Jackson,* the opinion cites the *Baxstrom* holding that ". . . a state prisoner civilly committed at the end of his prison sentence . . . was denied equal protection when he was deprived of a jury trial that the State made generally available to all other persons civilly committed. . . ."[32] In *Baxstrom,* the court said that ". . . there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments."[33] Then, in *Jack-*

---

other doctor testified that even if Jackson were not a deaf mute, he would be incompetent to stand trial, and doubted whether petitioner had sufficient intelligence ever to develop the necessary communication skills. . . ."

[29] *Id.* at pages 725, 726, the court stating: "Were the State's factual premise that Jackson's commitment is only temporary a valid one, this might well be a different case. But the record does not support that premise. . . . There is nothing in the record that even points to any possibility that Jackson's present condition can be remedied at any future time."

[30] *Id.* at page 738.

[31] *Id.* at page 728.

[32] *Id.* at pages 723, 724.

[33] *Id.* at page 724, citing and quoting *Baxstrom v. Herold, supra,* footnote 13.

*son,* the court commented that: ". . . The *Baxstrom* principle also has been extended to commitment following an insanity acquittal . . . ." [34] This brief observation of lower court extensions of the *Baxstrom* holding is not to be ballooned into a high court mandate against automatic commitment in insanity acquittal situations. Such informational comment does not delineate in any manner the nature or extent of the extension made by lower courts nor does it mandate that their example be followed.

Reluctance to escalate a mention into a proscription is strengthened by reference to the three cases cited. In one, the *Bolton Case,* [35] an earlier case, *Ragsdale v. Overholser,* [36] justifying immediate commitment in insanity acquittal cases to protect the public, is considered overruled. [37] In a second case cited, the *Lally Case,* [38] the same *Ragsdale v. Overholser* decision is cited, followed and its reasoning termed "sound." [39] In the third case, the *Cameron Case,* [40] the proposition that one acquitted by reason of insanity ". . . presumably constitutes a greater danger to the public than those civilly committed . . ." [41] is stated to be the basis for congressional adoption of the

[34] *Id.* at page 724, citing *Bolton v. Harris* (D. C. Cir. 1968), 395 Fed. 2d 642; *Cameron v. Mullen* (D. C. Cir. 1967), 387 Fed. 2d 193; *People v. Lally* (1966), 19 N. Y. 2d 27, 224 N. E. 2d 87.

[35] *Bolton v. Harris, supra,* footnote 34.

[36] *Ragsdale v. Overholser, supra,* footnote 10.

[37] *Bolton v. Harris, supra,* footnote 34, at page 649.

[38] *People v. Lally, supra,* footnote 34.

[39] *Id.* at page 33.

[40] *Cameron v. Mullen, supra,* footnote 34.

[41] *Id.* at page 200. *See also:* Page 201, footnote 26, stating: "See, e. g., Sen. Rep. No. 1170, H. R. Rep. No. 892, 84th Cong., 1st Sess. (1955), at p. 13: 'The Committee is of the opinion that the public is entitled to know that, in every case where a person has committed a crime as a result of a mental disease or defect, such person *shall* be given a period of hospitalization and treatment to guard against imminent recurrence of some criminal act by that person.' (Emphasis in original.)"

statute involved, and cases are cited in which such justification ". . . has found expression . . ." [42] with *Ragsdale v. Overholser* included. *Ragsdale v. Overholser* holds those who have obtained verdicts of not guilty by reason of insanity to be "an exceptional class of people" treated differently from persons who have not committed offenses or obtained verdicts of not guilty by reason of insanity.[43]

*Due process of law.* The ". . . nontreatment factors involved in his commitment . . ." [44] and the ". . . public safety requirements for his release . . ." [45] are relevant to petitioner's claim that commitment following insanity acquittal denied due process. They are a reminder that the petitioner was found not guilty of the commission of a criminal offense solely on his asserted defense of being insane at the time of commission of the offense.[46] It is such nontreatment factors and such public safety requirements for release that establish the basis and need for what in *Schopf* was termed ". . . proper custodial handling so that the community is protected from individuals who may be dangerous to other persons." [47] In the *Lally Case*,[48] heretofore discussed, the emphasis

[42] *Id.* at page 200. *See also:* Page 201, footnote 26, continuing: "See Overholser v. Leach, 103 U. S. App. D. C. 289, 291, 257 F. 2d 667, 669 (1958), cert. denied, 359 U. S. 1013, 79 S. Ct. 1152, 3 L. Ed. 2d 1038 (1959); Ragsdale v. Overholser, 108 U. S. App. D. C. 308, 281 F. 2d 943 (1960); Overholser v. O'Beirne, 112 U. S. App. D. C. 267, 302 F. 2d 852 (1961). See also Lynch v. Overholser, 369 U. S. 705, 715–716, 82 S. Ct. 1063 (1962; . . ."

[43] *Ragsdale v. Overholser, supra,* footnote 10, at page 946 (Quoting *Overholser v. Leach, supra,* footnote 10.)

[44] *Treglown v. H&SS Department, supra,* footnote 2, at page 327.

[45] *Id.* at page 327.

[46] *See: State v. Esser, supra,* footnote 7, on legal defense of insanity.

[47] *State ex rel. Schopf v. Schubert, supra,* footnote 4, at page 652.

[48] *People v. Lally, supra,* footnote 34.

upon the need to protect the public is evident in the court's refusing to declare unconstitutional a New York State statute providing for automatic commitment following an insanity acquittal verdict. In refusing to strike down the statute, the court said: ". . . We see no reason why a man who has himself asserted that he was insane at the time the crime was committed and has convinced the jury thereof should not in his own interest *and for the protection of the public* be forthwith committed for detention, examination and report as to his sanity."[49] (Emphasis supplied.)

In *Lally,* in upholding the constitutionality of the statute providing for automatic commitment of defendants found not guilty by reason of insanity,[50] the court placed emphasis upon the opportunity provided the persons committed to ". . . challenge the validity of his continued detention . . . ."[51] It noted that, under its insanity acquittal law, as under ours, the person committed ". . . may make, to the court by which he was committed, an application for his release or discharge . . . ."[52] It noted that, under their statute, as is the case under ours, the person committed can at any time ". . . ask for a hearing as to his present condition. . . ."[53] It noted that the petitioner before it did not ask for such a hearing, just as the petitioner in the case before us has not, but instead ". . . stood on his contention that his original and continued detention was

[49] *Id.* at page 33.

[50] *Id.* at page 30, the court noting that the statute involved provided that: ". . . when in a criminal case the defense pleads insanity and the jury acquits on that ground the court must order the defendant to be committed to the custody of the State Commissioner of Mental Hygiene to be placed in an appropriate institution in the Mental Hygiene or Correction Department approved by the head of such department. . . ."

[51] *Id.* at page 33.

[52] *Id.* at pages 30, 31.

[53] *Id.* at page 33.

illegal because of the alleged unconstitutionality of the statute." [54] In *Lally,* the state appellate court did read into the statutory provisions for such applications and hearings ". . . a provision for a jury trial of these issues, if appellant so requests. . . ." [55] The petitioner in the case before us already has such right to jury trial on application for re-examination. [56] (In fact, he already has had three such re-examination hearings.) In rejecting the due-process challenge to the Wisconsin law, we give weight to the right to petition for re-examination of status and mental condition that is afforded to persons committed following insanity acquittals.

The person committed following an insanity acquittal verdict may petition the court for re-examination of his mental condition and a determination of whether he may safely be released without danger to himself or others at any time after such commitment. As was said in *Schopf,* ". . . the prisoner adjudicated not guilty by reason of insanity can initiate proceedings to be re-examined and perhaps released the moment he arrives at the Central State Hospital. . . ." [57] The person found not guilty by reason of insanity and consequently committed is ". . . sent to Central State Hospital, but with the right to petition for an examination the minute he arrives. . . ." [58] As *Schopf* puts it, ". . . When he petitions for the examination, he gets it." [59] This aspect of the Wisconsin insanity acquittal commitment law pro-

[54] *Id.* at page 34.

[55] *Id.* at page 35.

[56] *See:* Sec. 971.17 (2), Stats., incorporating the provisions of sec. 51.11(5), Stats., providing in part: ". . . If a jury trial is demanded, the procedure shall, as near as may be, be the same as in s. 51.03, and the court's order or determination shall be in accordance with the jury's verdict."

[57] *State ex rel. Schopf v. Schubert, supra,* footnote 4, at page 654.

[58] *Id.* at page 654.

[59] *Id.* at page 655.

vides adequate process to the petitioner here, and others in his same category. So, exactly as *Schopf* concluded in precisely the same situation, the writer would hold the procedures legislatively provided in this state to be ". . . constitutionally adequate to satisfy the requirements of due process . . . ." [60]

*Finding of dangerousness.* This dissenting opinion has stressed what this court has termed ". . . [t]he primary importance of the public safety factor involved in the automatic confinement of a defendant acquitted on the grounds of insanity . . . ." [61] The importance of this public protection factor is also emphasized in the reference in *Jackson v. Indiana* to a federal statute, 18 USC 4247, applicable on its face to convicted criminals whose federal sentences are about to expire and by judicial interpretation to defendants incompetent to stand trial. This statute ". . . permits commitment if the prisoner is (1) 'insane or mentally incompetent' and (2) 'will probably endanger the safety of the officers, the property, or other interests of the United States. . . .' " [62] The *Jackson* decision notes that a person committed under this section ". . . must be released when he no longer is 'dangerous.' " [63] It notes that, in *Greenwood*,[64] it had upheld even a pretrial commitment under this statute of a defendant who had met all three conditions, but had done so only because ". . . the District Court had in fact . . . found specifically that Greenwood would be

[60] *Id.* at page 653.

[61] *Treglown v. H&SS Department, supra,* footnote 2, at page 326.

[62] *Jackson v. Indiana, supra,* footnote 12, at pages 731, 732.

[63] *Id.* at page 732, the court noting that: "One committed under this section, however, is entitled to release when any of the three conditions no longer obtains, 'whichever event shall first occur.' "

[64] *Greenwood v. United States* (1956), 350 U. S. 366, 373, 374, 76 Sup. Ct. 410, 100 L. Ed. 412.

dangerous if not committed . . ." [65] and, accordingly, ". . . Greenwood was entitled to release when no longer dangerous . . . ." [66] While the high court is discussing here a commitment of a defendant found incompetent to stand trial, it clearly states that the *Greenwood* commitment was sustained ". . . only upon the finding of dangerousness. . . ." [67]

In the case of an insanity acquittal commitment, the writer would hold the element of dangerousness to others to be supplied by the fact of an acquittal solely on the basis of insanity, with the public entitled by that fact alone to commitment with the right of immediate re-examination assured the person committed and confinement and treatment mandated until the person committed ". . . may safely be discharged or released without danger to himself or others. . . ." [68] However, the writer sees the statute strengthened against future challenge by the majority's requiring that the same jury which finds a defendant not guilty by reason of insanity at the time of the offense also answers whether or not the defendant, at the time of the verdict, is insane or dangerous to himself or others. If the jury that found the defendant insane at the time of omission of the offense were to find such defendant sane and no danger to himself or others at the time of verdict, the dual basis for and purpose to be served by commitment to a treatment facility would be specifically negatived. If the jury found that such insanity-acquitted defendant was either presently insane or dangerous to himself or others, not much would be added except the buttressing of the statute against a possible constitutional challenge based on some expansion and extension of what was said in the *Green-*

---

[65] *Jackson v. Indiana, supra,* footnote 12, at page 732.

[66] *Id.* at page 732.

[67] *Id.* at page 736.

[68] Sec. 971.17 (2), Stats.

*wood Case*. However, certainty is the goal of the judicial process, and particularly so in the criminal field. So the writer accepts as a proper and prudent procedural requirement under the insanity acquittal statute the majority requirement that the jury, if it finds the defendant not guilty by reason of insanity, also be required to answer whether or not it finds that such defendant, at the time of the verdict, is either insane or presents a danger to himself or others.

This long enough journey ends with the writer concluding: (1) The Wisconsin insanity commitment law does not deny either equal protection or due process of law; and (2) the added requirement that, where a jury finds a defendant not guilty by reason of insanity, it also determine whether such defendant is insane or dangerous to himself or others at the time of the verdict is a proper and prudent procedural requirement.

I am authorized to state that Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN concur in the portion of this opinion that upholds the constitutionality of the insanity acquittal commitment statute, sec. 971.17 (1), Stats.